**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00027-CR**
_____

**CHRISTOPHER BLAKE PAULETTE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 1A District Court**
**Tyler County, Texas**
**Trial Cause No. 13,498**

## MEMORANDUM OPINION

A jury found Christopher Blake Paulette guilty of the capital murder of Susan Morris, and the trial court sentenced him to life imprisonment without the possibility of parole. *See* Tex. Penal Code Ann. § 19.03(a)(2). In three issues, Paulette challenges the trial court's admission of certain evidence. We affirm.

Testimony of Byron Stowe

Byron Stowe, a dispatcher with the Tyler County Sheriff's Office, testified that early on December 21, 2018, he received a 911 call about an incident in Hillister. State's Exhibit 4, which Stowe identified as a recording of the 911 call and is approximately three minutes long, was admitted into evidence over defense counsel's objection. The recording of the call was played for the jury and Stowe testified that the call ended when the caller hung up, despite Stowe asking him to stay on the line. Stowe testified that Brandon Wood, who was identified on the recording as the caller, was deceased at the time of trial.

Recording of the 911 Call

On the recording of the 911 call, Wood stated he was calling to report "a 911 emergency" at "Pedro's" house in Hillister. Wood was breathing heavily and stated he did not know the address, he frantically tried to describe directions to the house, and the dispatcher told him to "calm down a little bit[.]" Wood reported that Pedro had a young man at his house "ziptied up[,]" Pedro had a gun in his hand, and Wood "had to get out of there as soon as [he] could." Frustrated as he tried to give general directions to the house, he told dispatch "y'all have already dealt with this man not too long ago" with Pedro's "girlfriend's overdose" at the house. Wood reluctantly identified himself to dispatch, admitted he had warrants, and told dispatch they

2

needed to "please get there man because he's got him ziptied[.]" The dispatcher tried to calm Wood down and told him he was trying to get a good location from him so someone could respond. Wood explained he "had to act like [he] was okay with it" and go along with it because Pedro had a gun and was "serious." Wood said he could not get to the man to untie him because he did not want to have to fight Pedro for the gun. Dispatch informed Wood that someone was on their way out to the location. The recording ended with the dispatcher telling Wood he was going to "keep [him] on the line for a little bit."

Testimony of Deputy Joshua Robison

Deputy Joshua Robison with the Tyler County Sheriff's Office testified that he was training with another deputy on December 21, 2018, and they responded to a 911 call in Hillister relating to an "unlawful restraint offense." According to Deputy Robison, he and Deputy Cloyd approached the house, knocked on the door, and announced "sheriff's office." Deputy Robison testified that, after about a minute, Robert Sims came to the door with his wrists securely bound in a zip tie and a broken zip tie was around one of his ankles. Deputy Robison spoke with Sims and learned that he had used a lighter to break the zip tie on his ankles, and Deputy Robison broke the zip tie on Sims's wrists with a knife. Deputy Robison testified that he observed the burn mark on the ankle zip tie, it appeared that Sims had burned the zip tie to escape it, and Sims seemed in shock and did not seem to know what was going

3

on or where he was. The body camera recording from Deputy Robison was admitted into evidence and played for the jury.

Testimony of Officer Haiden Hughes

Officer Haiden Hughes, an officer with the Silsbee Police Department who was working for the Tyler County Sheriff's Office at the time of the murder, testified that he responded to the hostage call involving an armed male, and Officer Hughes arrived at the scene less than a minute after Deputies Cloyd and Robison. According to Officer Hughes, he covered the back corner of the house where there was a door while the deputies went to another door on the east side.

Once he learned that a man came out of the house zip tied, Officer Hughes entered the house with his weapon drawn shortly after the deputies had entered and cleared the south end of the home. Officer Hughes testified that he looked down the hallway into a dimly lit room and saw a man, later identified as Paulette who also goes by the alias "Pedro," sitting in a chair with a black object in his hands. Concerned that the man had a weapon, Officer Hughes gave verbal commands for the man to put his hands up and put his hands on his head. Officer Hughes testified that although Paulette was hesitant to comply, he stood up from the chair and finally put his hands on his head. Officer Hughes asked him to lie down on the floor, and Paulette was restrained and handcuffed. Officer Hughes testified that Paulette said

4

something like, "I didn't mean to. I didn't do it[,]" and Officer Hughes transported him to the jail.

Officer Hughes testified that when he arrived at the jail sally port, he exited the patrol vehicle, walked around to open the door for Paulette to exit the vehicle, and he noticed Paulette had pulled his pants down "below his rear[,]" a billfold was in the backseat of the car, and "stuff was strewed everywhere[.]" Officer Hughes placed the items back in the billfold and took Paulette into the jail.

Officer Hughes testified that the following day he opened the back seat of his patrol car to get his jacket and found a debit card, bent in half, on the opposite side of the seat from where Paulette had been sitting. Officer Hughes put it in his pocket and then gave it to Brian Seales to put in the property room. At trial, Officer Hughes identified the debit card he found, which was stored in a bag labeled with his name and date, time, and location of recovery, and it was admitted into evidence. Officer Hughes testified that the name on the debit card was "Susan R. Morris," and the last four digits of the card number were "3324."

Officer Hughes testified that after he transported Paulette to the jail he returned to the residence where Paulette had been arrested to investigate with a search warrant. Officer Hughes described the house as in "[s]hambles, dope everywhere[,]" with narcotic paraphernalia, residue, needles, firearms, and spent shell casings scattered in the house. There were materials for making a homemade

firearm silencer and there were also multiple homemade suppressors or silencers in the house. In the location where Paulette had stood up when Officer Hughes had given verbal commands, Officer Hughes located a loaded black semiautomatic .22 pistol with a black homemade suppressor attached to it. According to Officer Hughes, he was looking anywhere a firearm or drug paraphernalia could be hidden, and when walking through the house he noticed the entrance to the attic ajar and the attic light was on.

There was not a ladder to the attic and Officer Hughes placed his body camera up in the attic and then climbed up the AC and water heater to enter the attic. Officer Hughes testified that he then noticed blood and a body. A search of a Cadillac sedan at the scene resulted in the recovery of paraphernalia and a new, still in the box, hand-motorized auger used for digging holes in the ground. The recording of the body camera during Officer Hughes's search of the attic was admitted into evidence and played for the jury.

The recordings from his body camera at the time of Paulette's arrest and from the back of his patrol car when he transported Paulette were admitted into evidence at trial and published for the jury. When the recording from the patrol car from Officer Hughes's transport of Paulette to the jail was played at trial, Officer Hughes testified that he saw Paulette in the video throw what appeared to be the debit card across his body with his right hand and the item flew to the left side of the vehicle.

6

Testimony of Scott Wheat

Scott Wheat, Assistant Fire Marshall with Beaumont Fire Rescue, testified that he was called out to the scene because there was suspected fentanyl in the residence, and his team was the closest regional hazardous materials response team with proper equipment to make entry. According to Wheat, the response team was asked to go into the attic to retrieve the deceased victim because of the possibility of fentanyl in the attic. Wheat testified that the response team cut a hole in the side of the house to remove the body. Wheat was the first of his team to enter the attic and he took photographs of the scene which he testified he was trained to do as an arson investigator.

Wheat testified that, once in the attic, he observed a large pile of debris and a female victim lying on her back, partially covered with various items, with her feet facing him. Wheat testified they collected the items in contact with the body, removed pink insulation from the victim's face, and then removed the body from the attic. According to Wheat, the victim's hands and feet were bound with plastic zip ties, and her hands were zip tied to a two-by-four support that ran from the floor of the attic to the ceiling. Photographs taken by Wheat of the scene were admitted into evidence and published to the jury. According to Wheat, there were plastic ribbons like "Easter grass material[]" near the body and the ribbons appear in the photographs of the body.

7

Testimony of Officer Casey Whitworth

Officer Casey Whitworth with the Tyler County Sheriff's Office testified that he responded to the scene after he learned that a person had been found there tied up and Paulette had been arrested with a weapon on him that morning. Officer Whitworth testified that he knew Paulette was a convicted felon and there were possibly more weapons in the house, so he requested "to hold the scene" while a search warrant was prepared.

Officer Whitworth testified he later learned that there was a body in the attic, and he collected evidence on December 21, 2018. According to Officer Whitworth, law enforcement took photographs of a pair of black Bates tactical boots on the floor in the master bedroom that in the dim lighting appeared to have paint or mud on them. Officer Whitworth testified that several days later, on a subsequent search warrant, the boots were collected and sealed as evidence. The boots were admitted into evidence as State's Exhibit 6a. Officer Whitworth testified that on the bottom of the heel of the boot there appeared to be stringy, plastic ribbons that appeared to be the same as those photographed with the body and resembled the pink insulation in the attic. Officer Whitworth testified that a presumptive blood test kit was performed on what appeared to be blood on the boots and that a heel print on the left side of the victim's face had "little round dots that matched what that boot would have caused."

8

According to Officer Whitworth, the boots were collected a few days after Paulette had been arrested. Officer Whitworth testified that law enforcement caught someone on the property that day. Officer Whitworth acknowledged that, because of the hole that had been cut on the top side of the house, the scene could not really be secured, and the evidence was not secured for the days between Paulette's arrest and when the boots were collected on December 21, 2018. Officer Whitworth testified that when Paulette was arrested, he was wearing tan tactical boots that did not have insulation or plastic ribbons on the bottom or blood stains.

Testimony of Martha Dawson

Martha Dawson, Precinct 2 Justice of the Peace for Tyler County at the time of the murder, was called to pronounce Morris deceased. Dawson testified she also ordered an autopsy.

Testimony of Detective Brian Seales

Detective Brian Seales with the Tyler County Sheriff's Office testified that he worked as an investigator on the case. Detective Seales identified the black boots and a pair of pants recovered from Paulette's residence and testified that he tested an apparent stain on the bottom of one of the boots and from the pants to determine if it was human blood. Detective Seales also testified they collected a stepladder from the residence and tested it to determine whether it had any blood on it. Detective Seales also submitted a search warrant for Morris's cell phone provider to

9

obtain the geolocation of her phone. According to Detective Seales, the geolocation data retrieved by AT&T revealed that Morris's cell phone location did not register anywhere near Morris's residence in Onalaska between December 14 and December 20, 2018, and that Morris's cell phone location registered near Paulette's residence on December 14th, 15th, 17th, 18th, and 20th.

Detective Seales testified that the black boots were not collected until December 28, 2018, seven days after Paulette was arrested. When asked who was in the house during that seven-day period, Detective Seales testified that a female subject admitted to going into the residence along with another male subject to retrieve some of her items and they were in the residence the day that the boots were collected.

Detective Seales testified that he had heard that Jacob Cooke had been a prior victim of Paulette's and interviewed Cooke in January of 2019. Detective Seales photographed Cooke's injuries that he reported were caused by Paulette at Paulette's residence, and those photographs were admitted at trial and published to the jury. According to Detective Seales, the photographs depicted scars on his arm and chest from a razor blade, an injury to his left leg, and an incision mark from his right knee.

Testimony of Dr. Tommy Brown

Dr. Tommy Brown, a forensic pathologist, testified he performed the autopsy on Morris. Dr. Brown's autopsy report was admitted into evidence. Dr. Brown

testified that Morris suffered "extreme battering of the face[]" consistent with blunt force trauma, had abrasions to her forehead and scalp, abrasions and contusions to her nose and both cheeks, and a lacerated ear. Dr. Brown testified that as for Morris's eyes she had "hematomas of the orbits bilaterally." According to Dr. Brown she had a larger laceration to the inside of her upper lip, her right front central upper incisor tooth had been knocked out, and she had lacerations, abrasions, and contusions in the chin area. Dr. Brown testified that in his opinion the bruising to her face and down her back were from injuries she would have sustained when alive and that the large area of bruising to her back was caused by multiple blows. She also had bruising to her chest area. Dr. Brown testified that Morris suffered burn injuries to her legs. Dr. Brown testified that there were two plastic zip ties around her neck, and underneath the zip ties were contusions, abrasions, and bruising. There was a plastic zip tie tight around her ankles and a laceration to one of her hands. Her hyoid bone, the bone at the top of the neck that holds muscles in place when swallowing, was broken and her thyroid cartilage was crushed. Morris also suffered a subdural hematoma, which the doctor testified would have been caused by her being hit in the head with a lot of force when she was still alive because there was hemorrhage. Dr. Brown concluded that Morris's death was caused by severe multiple blunt force trauma to the head, face, and neck.

The toxicology report from the autopsy revealed that Morris had very small, not life-threatening amounts of alprazolam (for anxiety and depression), morphine (pain reliever), fluoxetine and norfluoxetine (for anxiety and depression), hydroxyzine (an antihistamine), and amphetamine and methamphetamine. According to Dr. Brown, the presence of these drugs had nothing to do with Morris's death.

Testimony of Joseph Garza

Joseph Garza testified that Morris "was like a mother to [him]" and took him in and cared for him. According to Garza, he, his girlfriend, and his girlfriend's child lived with Morris in Onalaska for about a year and, in exchange for letting them live there, Garza would do jobs around the house and take care of Morris's dog. Garza testified that on Friday, December 14, 2018, he observed a tattooed white male whom he had never met arrive at Morris's house in a dark Cadillac. The white male, who referred to himself as "Pedro" and whom Garza identified at trial as Paulette, exited the Cadillac and spoke to Garza for fifteen or twenty minutes. Garza testified that he believed that Morris knew Paulette through a friend or her nephew. According to Garza, Morris left with Paulette that day to go to the casino in Livingston for a couple of hours, but she never returned home.

Garza testified that he became worried and tried to text her at least twenty times and call her twenty to thirty times, but no one would answer. Garza testified

that while she was gone, he received text messages from Morris's cell phone that he did not believe were from Morris, telling Garza not to worry if he saw purchases on her bank account. Garza testified that he thought this was strange because Morris knew Garza did not have access to her bank accounts.

Garza testified that Paulette returned to Morris's house without Morris on December 20, 2018, but he jogged or walked there. According to Garza, Paulette tried to explain why Morris had not returned, he talked about his weapons, and he wanted Garza and Tyrek Allison, who was also there, to go throw Paulette's knife into the tree in the backyard. Paulette gave Garza a cigarette box and $400 for Garza to go grocery shopping and do laundry because Garza was unemployed. Garza testified that Paulette stayed no longer than forty-five minutes and then left by foot. Garza admitted to using drugs in the past but denied ever using drugs when he lived with Morris.

Testimony of Tyrek Allison

Tyrek Allison testified that he knew Morris "[p]retty good[]" and lived with her briefly. Allison testified that it was common for Morris to give him grocery money and she did not charge him rent to live with her. Allison denied ever using drugs with Morris or at her house, and he denied ever seeing Morris use drugs.

According to Allison, he was not there the day Morris left, but after she left, he needed money for utilities and groceries, and he tried to call Morris but she never

13

answered. Allison testified that he tried to call her and request grocery money on December 19, 2018, and someone answered the phone breathing, but the phone hung up. He testified he believed it was Morris who answered because she sometimes answered her phone that way. He testified that "Pedro," who he identified at trial as Paulette, called him back and asked what Allison needed. Allison testified that he told Paulette that he needed to talk to Morris and Paulette said, "She's busy right now and she can't talk." Allison testified he told Paulette that he needed grocery money and there was no groceries or toilet paper in the house and Paulette told him he would "be there tomorrow to bring it." Allison asked to talk to Morris again and Paulette said she was busy, tired, and could not talk. Allison continued to try to contact Morris by texting her and one text he received stated that Pedro was taking care of her and not to worry about her and that she would be sending Pedro to the house with money and to get her medication. Allison testified that he had no way of knowing who sent the text but that was "not the way [Morris] texts."

Allison testified that the following day Paulette came over and said he parked his car at Brookshire's, and he jogged from Brookshire's to the house. According to Allison, Paulette seemed like he could not focus, introduced himself to Allison as "Pedro" and when Allison asked how he got the name Paulette answered that he got the name in prison. Allison testified that Paulette placed a Bowie knife on the table and gave Allison $300. Allison testified that Paulette lectured he and Garza that they

needed to stop depending on Morris and needed to get their lives together because they had just graduated. Paulette picked the knife up and asked Garza to go outside alone with him to talk and Allison stayed inside and watched through a window. Allison testified that Paulette took Garza to the back of the house and started throwing the knife at the tree and asking Garza to go get it for him. Allison believed Paulette was trying to intimidate them. Allison testified that his girlfriend came downstairs and gave Paulette a ride back to Brookshire's.

Testimony of Dylan Burson

Dylan Burson testified that he was working at the Boot Barn in Livingston on December 14, 2018, and he observed a heavily tattooed man, who Burson identified at trial as Paulette, come into the store acting strange. Burson testified that his manager asked him to follow the man and help him, and when Burson asked him if he needed help, he told him he did not. Burson testified that he helped a Jasper police officer in the boot department when Paulette began talking to the officer about how he liked the black tactical boots that the officer had on and that he wished he had enough to buy a new pair because the black tactical boots he had on were too heavy because they were steel toed. Burson testified that the black tactical boots that Paulette had on that day looked like State's Exhibit 6a and were steel toed like State's Exhibit 6a.

15

Testimony of Officer Drew Broom

Officer Drew Broom with the Jasper Police Department testified that on December 14, 2018, he worked as an officer with the Jasper County Sheriff's office and was off duty, not in uniform, and shopping at the Boot Barn in Livingston. Officer Broom testified that a man that he was "100 percent" sure was Paulette was in the boot department talking to a sales associate about how he preferred to wear Bates tactical boots because he felt comfortable in them and had been wearing that style for years. Officer Broom testified that he joined the conversation about boots and told Paulette that he was a peace officer in Jasper County and Paulette told him that he lived in Hillister off 1013.

According to Officer Broom, about a week later, he was looking at the Facebook page for the Tyler County Sheriff's Office, he saw Paulette's mug shot, and he contacted an investigator he knew to tell him about the encounter at the Boot Barn. The investigator told Officer Broom he would need him to provide a statement.

Testimony of Kenneth Zeller

Kenneth Zeller testified that at the time of trial he was serving a twelve-year concurrent sentence for burglary of a habitation and burglary of a building. Zeller testified it was his third time in the Texas Department of Corrections, but he had never testified in court, and he had not been offered anything for his testimony in this trial. According to Zeller, when he was in the Hardin County Jail in May of

16

2019, Paulette, who went by the name "Pedro," told him in the rec yard that he killed a girl by cutting her as part of a satanic ritual and that he and Brandon Wood tied a boy up, put him in a closet and were "going to get him next." Zeller testified that at the time of trial Brandon Wood was deceased and had been killed by Blaze Hicks, whom Zeller knew from jail. Zeller denied ever lying to law enforcement but acknowledged he had told a lie and used drugs. Booking sheets from the jail showing Paulette and Zeller were in the jail at the same time in late May 2019 through part of July 2019 were admitted into evidence.

Testimony of Jessica Lake

Jessica Lake, a forensic scientist with the Texas Department of Public Safety Crime Lab in Houston, testified that she drafted a lab report that summarized her finding for the evidence in the case. Lake testified that she tested stains from the boots, pants, and stepladder collected in this case and all three tested positive for blood. She testified she then prepared the samples for DNA analysis. Lake's lab report was admitted into evidence.

Testimony of Kerry Todd

Kerry Todd, a forensic scientist with the Texas Department of Public Safety Crime Lab in Houston, testified that she received items from Jessica Lake that were submitted by Brian Seales with the Tyler County Sheriff's Office to perform DNA analysis on them. Todd testified she also received buccal swabs from Christopher

17

Paulette, Robert Sims, and Susan Morris for purposes of DNA comparison. As for the blood stain on the left boot, Todd concluded that the DNA profile was from a single individual and obtaining the profile is 14.6 septillion times more likely if the DNA came from Susan Morris than if the DNA came from an unrelated, unknown individual and that Morris could not be excluded as a possible contributor to the profile. As a result of Todd's testing of the blood stain from the pants, she concluded that the DNA profile was from a single individual and obtaining that profile is 14.1 septillion times more likely if the DNA came from Susan Morris than if the DNA came from un unrelated, unknown individual and that Morris could not be excluded as a possible contributor of the profile. Todd testified that, after testing the blood stain on the stepladder, she concluded that the DNA profile was from a single individual and obtaining that profile is 10 septillion times more likely if the DNA came from Susan Morris than if the DNA came from un unrelated, unknown individual and that Morris could not be excluded as a possible contributor of the profile.

Testimony of Brian Lair

Brian Lair, Vice-President of Asset Protection for Brookshire Brothers, testified that after being contacted by the Texas Rangers he produced a CD of surveillance video from the Brookshire Brothers store in Onalaska from December 20, 2018, and the CD was admitted into evidence and played for the jury. Lair

18

testified that the video recording showed that at 12:31 p.m. an individual appeared at the office window in the store where checks were cashed or cash back on transactions could be processed. Lair testified that he pulled the receipts for the transactions, and the receipts, admitted at trial, showed that the individual used a debit card with the last four digits of 3324 to purchase a $100 Verizon card, a CRT battery, and receive $100 cash back for a total of $238.37, at 12:37 p.m. the individual used the same debit card to purchase a $500 Best Buy gift card, and at 12:38 p.m. used the same debit card to purchase a $200 Best Buy gift card. After being shown Morris's debit card admitted into evidence, Lair testified that the last four digits of the card were 3324 and that he believed this was the card used to make the purchases.

Testimony of Jennifer Kelley

Jennifer Kelley testified that she was the manager of Family Dollar in Spurger on December 19, 2018. According to Kelley, she provided surveillance footage to law enforcement from inside the store on that day, and a video recording of the footage was admitted into evidence and published to the jury. Kelley testified that the footage showed a white male checking out around 8:45 p.m. and that one of the receipts she retrieved and printed for the transaction showed the white male used a debit card ending in 3324 on a transaction for $533.01 for a speaker and a $500 prepaid BayMax debit card. The receipt was admitted into evidence.

Testimony of Jacob Paul Cooke

Jacob Cooke testified that he met Paulette at a mutual friend's house in December of 2017. He told Paulette that he did not have a place to live, and Paulette told him he could live with him if he helped him with some things on the computer. That night, Cooke went to stay with Paulette at Paulette's house, and Paulette was initially nice to Cooke. According to Cooke, at one point he walked out to Paulette's garage and Cooke asked him why it smelled like rotting flesh and Paulette told him not to worry about it and Paulette showed him his mug shot and said it was from when he shot and killed five people.

Cooke testified that one night he told Paulette he wanted to leave, and Paulette encouraged him to wait until the next morning. Cooke testified that that night although Paulette knew where his SD card to his computer was, he asked Cooke where it was and hit Cooke's leg with a baseball bat and broke Cooke's tibia. According to Cooke, he was able to hobble outside to the yard and then Paulette approached him at "blinding speed[]" and broke his patella with the baseball bat. Cooke testified that Paulette ordered him to get up and go inside, and Paulette told him he was going to kill him that night. Cooke testified that once inside, Paulette duct-taped his arms behind his back, duct-taped his ankles, put him in the master bathtub for hours, made him ingest about fifteen Trazodone pills and a handful of Tylenol PMs, told him that the day he met him he planned on killing him and no one

20

would miss him, shaved his eyebrows, cut him with razors, and sprayed him with hairspray and tased him until he caught fire.

Cooke testified that some people came to the door and then Paulette decided to let Cooke live and let him sleep in the recliner. Over the next few days, Paulette would leave at night and then in the morning Cooke would let him in because he was afraid Paulette would beat him with the bat, and Paulette discussed plans with Cooke about staging a burglary so Paulette could justify Cooke's injuries if Cooke sought medical attention. He let Cooke leave but threatened that if Cooke sought medical attention and told them what Paulette did to him, Paulette would take a gun to the hospital and shoot Cooke and everyone in the hospital.

Cooke testified that he hobbled to Paulette's driveway, flagged down a car, lied to the elderly driver and told her he was in a motorcycle accident because he did not want her to be afraid, and asked her to take him to Walmart. Once at the Woodville Walmart, an ambulance transported him to the hospital. Cooke testified that he had surgery and his patella was repaired with three screws and about fourteen wires. Photographs of Cooke's injuries were admitted into evidence at trial and published to the jury.

Testimony of Officer Garrett Chase Nalley

Officer Garrett Chase Nalley with the Tyler County Sheriff's Office testified that around January 2018 he was on duty and responded to a call from Walmart

21

regarding an injured man. When he arrived there, he found a man on a bench in a great amount of pain. Video footage from Officer Nalley's body camera from the encounter was admitted into evidence and published for the jury. Officer Nalley testified that he did not believe that the man had been in a wreck.

Testimony of Robert Sims

Robert Sims testified that Paulette's nickname was "Pedro" and that was what Sims called Paulette. Sims testified that he was at a gas station in Hillister on December 16, 2018, and Paulette picked him up in a silver Cadillac. According to Sims, they went to Paulette's house and Paulette showed him a woman he did not know who was still alive, but she was bruised, burned, and tied up with zip ties and in a bathroom cabinet. Sims testified that Paulette told him Sims had to do what he said, or he would kill Sims and his family. Sims testified he was terrified, and Paulette asked him to put the woman in the attic. According to Sims, Paulette cut the zip ties off the woman's feet and made the woman step into the attic and pulled her up while Sims pushed her up into the attic. Sims testified that he helped Paulette put the woman in the attic because he was scared if he refused Paulette would beat him up, tie him up, and torture him. Sims got up into the attic with Paulette and the woman, and Paulette zip tied her feet and stomped on the woman's face "[a] lot[]" and "[f]or a while." Paulette threatened that if Sims did not watch him beating the woman, he would kill Sims. According to Sims, he was afraid to leave and stayed at

22

the house for several days and the entire time he and Paulette used methamphetamine, Xanax, and heroin provided by Paulette. Sims testified that after they had put the woman in the attic, Brandon Wood showed up but did not see or know about the woman in the attic. Sims testified that during that time he and Paulette had an argument because Sims said he would not help him anymore, and Paulette and Wood tied Sims up with zip ties. Sims testified that he heard a knock at the door when Paulette was asleep, Sims found a lighter on the ground and was able to burn the zip ties off his feet, he answered the door, and it was the police. Sims testified that Wood was also able to get out of the house.

Sims testified that he was "100 percent[]" sure that Paulette was the person he saw in Paulette's attic stomping on Morris's face, and that Paulette was wearing black combat boots at the time and Sims was wearing Adidas sneakers. Although Sims denied causing the woman any injuries, he admitted that a year later he killed his grandfather when Sims was "off [his] meds[,]" and he was in custody for that crime at the time of Paulette's trial. Sims acknowledged that he provided the testimony in this case because the State agreed it would not prosecute him for Morris's murder, but he still faced prosecution for killing his grandfather.

Sims testified that he was in jail for the alleged murder of his grandfather. Sims stated that when law enforcement came out to Paulette's house, he told them at one time that he did not know anything about Morris because he was scared. Sims

23

also admitted that he has mental health problems and his attorney had filed with the court a request for a competency examination.

The defendant did not testify at trial and did not offer any witnesses. The jury found Paulette guilty of the capital murder of Morris and the trial court sentenced him to life in prison without the possibility of parole.

## Standard of Review

We review a trial court's admission of evidence under an abuse of discretion standard. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). We must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002). We will not disturb a trial court's ruling if it is correct on any legal theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## Admissibility of Challenged Portions of Cooke's Testimony

In issue one, Paulette argues the trial court erred in allowing Jacob Cooke's testimony about Paulette's kidnapping of and assault against him, which allegedly occurred almost a year before Morris's murder. According to Paulette, this testimony was about an extraneous offense, the evidence did not support any Rule 404(b)(2) permitted purposes for such evidence, and the defense did not open the door to any of those purposes during its cross-examination. Paulette also argued that the

testimony was not relevant under Rule 401, the testimony's probative value was substantially outweighed by danger of undue prejudice under Rule 403, the testimony likely led the jury to decide the case on an improper basis, the limiting instruction was insufficient to cure the error, and the trial court had no reasonable basis to justify the admission of the testimony because the trial court did not preview the evidence.

Rule 404(b) of the Texas Rules of Evidence provides in pertinent part as follows:

> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. (2) Permitted Uses[.] This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.…

Tex. R. Evid. 404(b). The list of enumerated purposes for which extraneous offense evidence may be admissible under Rule 404(b) is neither exclusive nor exhaustive. *Montgomery*, 810 S.W.2d at 388. Extraneous offense evidence may be admissible if it has relevance apart from its tendency to prove a person's character to show that he acted in conformity therewith. *Id.* at 387.

Based on the record before us, we conclude that the issue of whether the extraneous evidence was admissible for the noncharacter-conforming purposes of showing Paulette's identity and intent was within the zone of reasonable disagreement. *See Wheeler*, 67 S.W.3d at 888. First, the trial court could have

25

reasonably concluded that following cross-examination of Detective Seales regarding the black tactical boots (which were found at the scene but were not worn by Paulette at the time he was arrested, that had a blood stain that was consistent with Morris's DNA, and that had a pattern on the bottom of the sole that matched the imprint on Morris's face) put the identity of the suspect at issue:

Q. When's the first time you saw those boots?

A. Those boots? We – we first saw those boots in photographs that we initially took of the residence.

Q. Okay. Did you take the photographs? Let me ask you this: Were you at the residence?

A. Initially?

Q. Yes, sir.

A. I was at the residence. I did not go inside the residence.

Q. Okay. So, notwithstanding photographs, when was the first time that you physically saw those boots?

A. The date that we executed the search warrant to retrieve them.

Q. Okay. Do you remember what day that was, detective?

. . . .

A. . . . December 28th.

. . . .

Q. Well, what day were you at the residence at the time Mr. Paulette was arrested?

26

A. I believe that was the 21st.

Q. Okay. So those boots were in the residence for seven days?

A. Correct.

Q. Before they were ever put into any type of evidence?

A. Correct.

Q. Okay. Who was in the house after you left on the 21st until you got those boots on the 28th?

A. We had a female subject that admitted to going into the residence along with another male subject to retrieve some of her items.

Q. So there were people in that residence?

A. Yes, sir.

Q. There were people that were not law enforcement in that residence?

A. Yes, sir.

Q. So you've got the boots in evidence, you got them in evidence on December 28th, but how they got there prior to that you cannot testify to?

A. Can you rephrase your question?

Q. How did the boots get in the house?

A. I can't testify as to how the boots got there.

Q. Okay. Who had possession and/or access to the boots for seven days?

A. We secured the residence the best we could but as I -- as I mentioned in your earlier question, we have a female and a male subject who were in the residence the day that we went to retrieve the boots.

27

Also, the trial court could have reasonably concluded that Cooke's testimony was relevant to prove Paulette's intent to kill Morris. Officer Hughes testified that when Paulette was arrested, he said something like, "I didn't mean to. I didn't do it." Jacob Cooke's testimony was relevant in that it, in combination with Sims's testimony that he was kidnapped, zip tied, and tortured by Paulette, supported the State's argument that Paulette's killing of Morris was not unintentional, and that Paulette used zip ties and similar methods of torture on Sims.

Because the extraneous offense evidence had relevance apart from character conformity, we conclude that the trial court did not abuse its discretion in determining that Cooke's testimony was admissible under Rule 404(b). *See Montgomery*, 810 S.W.2d at 387-88. The trial court gave a limiting instruction, and we presume the jury followed the trial court's instruction. *See Renteria v. State*, 206 S.W.3d 689, 707 (Tex. Crim. App. 2006).

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Tex. R. Evid. 401. Relevant evidence is generally admissible. Tex. R. Evid. 402. Under Rule 403 of the Texas Rules of Evidence, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

28

"Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389. Once a trial court determines that extraneous offense evidence is admissible under Rule 404(b), the trial court must, upon proper objection by the opponent of the evidence, weigh the probative value of the evidence against its potential for unfair prejudice. *Id.*; *see* Tex. R. Evid. 403. When undertaking a Rule 403 analysis, the trial court must balance

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); *see also Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). However, if the only value of extraneous offense evidence is to show character conformity, the balancing test required by Rule 403 is obviated because "rulemakers hav[e] deemed that the probativeness of such evidence is so slight as to be 'substantially outweighed' by the danger of unfair prejudice *as a matter of law*." *Montgomery*, 810 S.W.2d at 387 (quoting *United States v. Beechum*, 582 F.2d 898, 910 (5th Cir. 1978)).

After balancing the Rule 403 factors, the trial court could have reasonably concluded that the probative value of Cooke's testimony was not substantially outweighed by the danger of unfair prejudice. *See id.* We conclude that the trial court did not abuse its discretion in admitting the challenged evidence. *See Moses*, 105 S.W.3d at 627; *Montgomery*, 810 S.W.2d at 391.

That said, even assuming without deciding that the trial court may have erred in admitting the challenged evidence, given the other evidence before the jury, we find that it is unlikely that the admission of Cooke's testimony affected Appellant's substantial rights or had a substantial effect on the jury's verdict. *See* Tex. R. App. P. 44.2(b); *Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999). After examining the entire record, we have fair assurance that the error, if any, did not influence the jury, or had only a slight effect. *See Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008). We overrule issue one.

Admissibility of Recorded 911 Call

In issue two, Paulette argues the trial court erred in allowing the State to play a recording of the 911 call made by Brandon Wood (State's Exhibit 4) to the jury and in admitting it into evidence. According to Paulette, playing the 911 call was an impermissible introduction of extraneous offense evidence under Rule 404(b)(1), it included hearsay statements that were not relevant and more prejudicial than probative and inflammatory, and it should have been excluded under Rules 401 and

403. Paulette also argues that playing the tape violated his constitutional right to confront the witness under the Sixth Amendment of the United States Constitution and that the statements in the call were testimonial under *Davis v. Washington*, 547 U.S. 813 (2006).

We have examined the record of the trial and the only objection the defense made to State's Exhibit 4 at trial was under the Confrontation Clause of the Sixth Amendment. Because Paulette did not raise his Rule 401, 403, and 404 objections at trial, those arguments are waived. *See* Tex. R. App. P. 33.1(a). As to Paulette's objection under the Confrontation Clause, the State argues that the call recorded in State's Exhibit 4 "is a textbook non-testimonial call seeking assistance in an on-going emergency[]" and admissible under *Davis* and *Michigan v. Bryant*, 562 U.S. 344 (2011).[1]

The Confrontation Clause of the Sixth Amendment affords an accused the right to confront witnesses in all criminal prosecutions. U.S. Const. Amend. VI. The Confrontation Clause prohibits admission of out-of-court statements that are testimonial in nature unless the prosecution can demonstrate that the out-of-court

---

[1] Although *Bryant* did not involve statements made in a 911 call, the Supreme Court has explained that in deciding whether statements are testimonial or not for Confrontation Clause purposes, we must look first to all relevant circumstances and, rather than inquiring into the subjective concerns of the parties in a particular encounter, we are to analyze objectively the circumstances of the case and the statements and conduct of the parties. *See Michigan v. Bryant*, 562 U.S. 344, 360, 369 (2011).

declarant is presently unavailable to testify, and the defendant has had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Whether a statement is testimonial or non-testimonial is a question of law that we review de novo. *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008); *Cook v. State*, 199 S.W.3d 495, 497 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (stating that we review de novo trial court's ruling that admission of statement did not violate rights under Confrontation Clause). "Testimonial" statements include, among other things, ex parte in-court testimony, or its functional equivalent, such as affidavits, custodial examinations, prior testimony that the accused was not able to cross-examine, and similar pretrial statements the declarant would "reasonably expect to be used prosecutorially." *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010) (citing *Wall v. State*, 184 S.W.3d 730, 735 (Tex. Crim. App. 2006)); *De La Paz*, 273 S.W.3d at 680 ("Generally speaking, a hearsay statement is 'testimonial' when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution.").

The primary focus in determining whether a particular hearsay statement is testimonial "is upon the objective purpose of the interview or interrogation, not upon the declarant's expectations." *De La Paz*, 273 S.W.3d at 680; *see Bryant*, 562 U.S. at 369; *Coronado v. State*, 351 S.W.3d 315, 324 (Tex. Crim. App. 2011) ("If the

objective purpose of the interview is to question a person about past events and that person's statements about those past events would likely be relevant to a future criminal proceeding, then they are testimonial."). Once a defendant objects to admission of a statement as a violation of the Confrontation Clause, the burden shifts to the State, as the proponent of the evidence, to establish that the statement (1) did not contain testimonial hearsay, or (2) did contain testimonial hearsay but was nevertheless admissible under *Crawford*. *De La Paz*, 273 S.W.3d at 680-81.

Courts have addressed whether calls to 911 constitute testimonial hearsay and thus whether the statements made in such calls violate the Confrontation Clause. In *Davis v. Washington*, the Supreme Court held that a domestic violence victim's 911 call reporting the defendant's assault of her was not testimonial and admission of the call did not violate the Confrontation Clause. 547 U.S. at 829. The Court explained:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822. The Court noted that, unlike a custodial interrogation, a 911 call, "and at least the initial interrogation conducted in connection with a 911 call, is ordinarily

33

not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827. In *Davis*, the declarant "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events,'" the declarant "was facing an ongoing emergency[,]" the declarant's statements "were necessary to be able to *resolve* the present emergency" rather than to simply learn what had happened in the past, and the declarant was not speaking during a formal interview but was providing "frantic answers" over the phone in an unsafe environment. *Id.* (quoting *Lilly v. Virginia*, 527 U.S. 116, 137 (1999) (plurality op.)).

The Court in *Davis* provided a non-exhaustive list of factors to consider when determining whether statements were made during an ongoing emergency, including: (1) whether the situation was still in progress; (2) whether the questions sought to determine what is presently happening as opposed to what has happened in the past; (3) whether the primary purpose of the interrogation was to render aid rather than to memorialize a possible crime; and (4) whether the events were deliberately recounted in a step-by-step fashion. *See id.* at 830-32; *Vinson v. State*, 252 S.W.3d 336, 339 (Tex. Crim. App. 2008). In determining whether statements are testimonial, courts generally look to the degree of formality of the declarant's interaction with police, the purpose and structure of police questioning, and the likelihood that the declarant expects that the statements could be used in a criminal

prosecution. *Cook*, 199 S.W.3d at 497-98. "Statements made to police during contact initiated by a witness at the beginning of an investigation are generally not considered testimonial." *Id.* at 498. Statements made during 911 calls are typically considered nontestimonial because they are "a cry for help" or "the provision of information enabling officers immediately to end a threatening situation." *See Davis*, 547 U.S. at 832; *Cook*, 199 S.W.3d at 498; *see also Ramjattansingh v. State*, 587 S.W.3d 141, 159 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Statements made during a 911 call under circumstances objectively showing that the primary purpose of the call was to enable police assistance for an ongoing emergency . . . are not testimonial.").

Here, Wood reported in the 911 call that he had escaped from Pedro's house, that Pedro had a man zip tied, and that Pedro had a gun. The dispatcher spent a large portion of the call trying to get a good location from Wood so dispatch could send assistance out. The emergency was ongoing as Wood was breathing heavily and pleaded with dispatch to hurry to aid the man zip tied at Pedro's house. On this record, the trial court could have reasonably concluded that Wood's 911 call was nontestimonial. *See Ramjattansingh*, 587 S.W.3d at 161; *Cook*, 199 S.W.3d at 498. Accordingly, the trial court's admission of the call did not violate Paulette's rights under the Confrontation Clause. *See Cook*, 199 S.W.3d at 498. We conclude that the

trial court did not abuse its discretion in admitting State's Exhibit 4. We overrule issue two.

Admissibility of Challenged Portion of<br>Officer's Whitworth's Testimony

In issue three, Paulette argues the trial court erred in allowing Officer Whitworth to testify that he knew Paulette was a convicted felon. According to Paulette, that testimony was neither contextual nor relevant and instead was highly prejudicial and grounds for granting a mistrial.

In a motion in limine, Paulette requested that the State and witnesses be precluded from referring in front of the jury to any prior convictions or alleged violations by Paulette. The State asserted that the only prior conviction or arrests it thought would be introduced through evidence was that Paulette was arrested in this case for felon in possession of a firearm. The State argued such evidence was admissible as context because that was the offense for which he was arrested in the case and the evidence would show that when law enforcement found Paulette at the scene he was in possession of a firearm. The trial court agreed that why someone was arrested "would have to be part of the case in chief[.]" The defense told the court that when that evidence was introduced, "we'll object, you can overrule, it's on the record," and the trial court responded, "That's fine."

Officer Whitworth testified that after he learned Paulette had been arrested that morning with a weapon on him, Officer Whitworth proceeded to get a search

36

warrant because he knew Paulette was a convicted felon and there were possibly more weapons on the premises. Then the following exchange occurred:

[Defense counsel]: Going to object, your Honor. Can we approach?

THE COURT: You may.

. . . .

[Defense counsel]: Your Honor, we discussed this in motion in limine. Mr. Whitworth has testified that our client is a convicted . . . felon. I think that is a blatant motion for mistrial.

[Prosecutor]: Judge, I've been through this before. . . . This is contextual evidence. It comes in because that's what he was arrested for and we can't give the jury something in a vacuum. And I sat up here and went over it and over it again with the law and everything else.

THE COURT: Yeah. I thought that there was not going to be an objection if it was contextual. Are you saying that it wasn't? Are you arguing that it was not at this point?

[Defense counsel]: If he would have said, Your Honor, that we arrived at the scene because the individual had been charged with a firearm and there was a possibility that it was a felon in possession of a firearm, I wouldn't have an issue with that. He said he is a convicted felon.

[Prosecutor]: Judge, to be a felon with a firearm, it is laid out in the statute he has to be convicted felon. That's the bottom line.

THE COURT: I'm going to deny the motion for mistrial, and we're going to move forward.

Even assuming without deciding that it was error for the trial court to admit the evidence, "it is well settled that an error in [admitting] evidence is cured where the same evidence comes in elsewhere without objection[.]" *Ethington v. State*, 819

S.W.2d 854, 858 (Tex. Crim. App. 1991); *see also Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998). To preserve his right to complain about Officer Whitworth's testimony that Paulette was a convicted felon, Paulette needed to object each time the same evidence was offered into evidence. *See Leday*, 983 S.W.2d at 718 (explaining that, since Texas applies the "futility rule," a party must continue making futile objections on pain of waiver, even though the trial court previously ruled the evidence admissible.) The fact that Paulette was a convicted felon came in through State's Exhibits 5 and 9, and Paulette did not object to the admission of those exhibits. Because the trial court admitted State's Exhibits 5 and 9 without objection, Paulette cannot now successfully complain that the trial court erred by admitting the same evidence through Officer Whitworth's testimony. *See id.* Issue three is overruled.

We affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on November 30, 2021
Opinion Delivered January 12, 2022
Do Not Publish

Before Kreger, Horton and Johnson, JJ.